RAYMOND WILLIAMS *et al.*, Plaintiffs-Appellants, v. CHICAGO OSTEO-
PATHIC HEALTH SYSTEMS *et al.*, Defendants-Appellees.

First District (5th Division) No. 1—93—2429

Opinion filed August 18, 1995.

Robert J. Pavich and Barry A. Spevack, both of Monico, Pavich & Spevack, of Chicago, for appellants.

Rudolf G. Schade, Jr., Jennifer A. Keller, and Susan M. Hyser, all of Cassiday, Schade & Gloor, of Chicago, for appellee Chicago Osteopathic Health Systems and Chicago Osteopathic Hospitals.

JUSTICE T. O'BRIEN delivered the opinion of the court:

This case involves a stillbirth which occurred at the Chicago Osteopathic Hospital on November 7, 1985. The baby's parents, Raymond and Lucille Williams, brought a fraud action against certain doctors, defendants Louis Papp, D.O., Angelo Alexander, D.O., Catherine McDermott, D.O., and David Raminski, D.O., as well as the hospital. The parents alleged that the doctors failed to tell them that their stillborn baby developed a heart rate at some point after the delivery. They claim that had they known of the baby's post-delivery condition they would have spent more time with the baby and would have insisted that the baby receive life-sustaining treatment.

The case proceeded to trial. At the close of plaintiffs' case in chief, the circuit court directed verdicts for defendants Drs. Papp and Raminski, but denied the same motions made on behalf of the other defendants. At the close of all the evidence, the circuit court directed

verdicts for the remaining defendants, Dr. Alexander, Dr. McDermott, and the hospital after the jury could not reach a verdict.[1]

Plaintiffs appeal, contending that the evidence presented questions of fact which only the jury could properly resolve and therefore the court should not have granted defendants' motions for directed verdict. We affirm.

## BACKGROUND

On the morning of November 7, 1985, when Lucille Williams was in the second trimester of her pregnancy, she began experiencing back pains. She went to Chicago Osteopathic Hospital, where she was examined by Dr. Thomas Losure, a high-risk perinatalogist. After determining the fetus' gestational age to be between 22 and 24 weeks, he informed Lucille that she was in danger of going into premature labor. Dr. Losure also explained that if she delivered the baby, it would have no chance of survival and no aggressive treatment of the premature newborn would be undertaken. He told both Lucille and her husband that they were welcome to get a second opinion if they so desired, but that they should do so prior to delivery of the fetus.

Dr. Losure further related to Lucille that an obstetric team would try to prevent a premature birth through the use of labor-inhibiting drugs. The obstetric team consisted of, among others, Dr. Alexander, the chief resident obstetrician, and Dr. Raminski, an intern. Lucille thereafter began receiving medication to prevent contractions.

Before leaving the hospital for the day, Dr. Losure consulted with Dr. Alexander. Dr. Losure did not expect any aggressive treatment to be performed on the infant if delivery occurred. However, Dr. Alexander was to use his "best judgment" whether to resuscitate the baby if it were born alive. Dr. Losure suggested that they not use a fetal heart monitor in this situation because Losure felt it would be "cruel" to allow Lucille to "hear" her baby's heartbeat because "it starts to go down, that she has to listen to the baby die."

---

[1]On appeal, plaintiffs assert that the hospital is liable for the conduct of its nurses as well as the named doctor defendants. However, none of the nurses were ever named as defendants in this case, and the jury instructions regarding the hospital's liability did not specify any conduct on the part of the nurses which would provide a basis for liability. The record does not indicate whether such a jury instruction was ever submitted or, if it was, whether the trial judge denied it. If a tendered instruction was denied, plaintiffs have failed to preserve that denial as an issue in this appeal. If plaintiffs failed to submit such an instruction, we must view that failure as a waiver. Points not argued in the circuit court may not be raised for the first time on appeal.

Unfortunately, Lucille began to have labor pains by 10 p.m. despite the labor-preventing medication. Although Dr. Losure had advised against it, Lucille was attached to a fetal heart monitor. Dr. Raminski, who was still on duty, last saw Lucille at 10:45 p.m., at which time the monitor registered a fetal heart rate.

Later, Dr. Alexander observed that the fetus' heart rate had ceased to register on the monitor at approximately 11:10 p.m. Moreover, he could not detect any fetal heartbeat with his fetoscope. A few minutes later, Lucille's water bag ruptured, and the baby presented in a breech position. Dr. Alexander delivered the baby, a girl, in the labor room at 11:19 p.m. At that time, Dr. Alexander told Lucille that the baby was stillborn.

Dr. Alexander examined the baby after birth and assigned APGAR scores based on these examinations.[2] At that time, the baby appeared blue and limp, and her skin was gelatinous, *i.e.*, transparent. Dr. Alexander stated that if the baby had exhibited any signs of life, he would have called pediatrics. He discerned no such signs.

Dr. Raminski, who had not been present for the actual delivery, returned to the labor room and saw Dr. Alexander examining the baby. Dr. Alexander informed him that the delivery had been a stillbirth. Dr. Raminski saw that the baby, which fit in Dr. Alexander's hand, was purple, blue, and limp. Dr. Raminski saw no signs of life in the baby.

Dr. Alexander asked Lucille if she wanted to see the baby, but she declined. He then gave the baby to Nurse Suvaluk Kaeowichien. Consistent with hospital protocol, Kaeowichien took the baby to a utility room and cleaned the baby off. Although she tried to listen for a heartbeat with a stethoscope, Kaeowichien could not detect one.

Dr. Alexander instructed Dr. Raminski to comfort the parents. To that end, Dr. Raminski encouraged them to see the baby and was with them when Kaeowichien brought the baby back into the labor room at approximately 12:15 a.m. According to Lucille, the nurse held up the baby, the towel fell open, and the baby's leg "dropped." Her husband asked the nurse if the baby had moved or had taken a breath. Kaeowichien explained to the parents that it was a "reflex." Dr. Raminski, who also heard a "noise" or a "gasp" when Kaeowichien moved the towel away from the baby's body, likewise stated that the baby's appearance had not changed since delivery, and he did not think the "gasp" was a sign of life. Kaeowichien took the baby back to the utility room, without protest from the parents.

---

[2]An APGAR score indicates, *inter alia*, the heart rate and the respirations of a newborn at both one and five minutes after delivery.

Dr. Alexander had further instructed Dr. Raminski to prepare a delivery note in which Dr. Raminski was to record the events which had occurred during the delivery. At 12:30 a.m., Dr. Raminski wrote the note, indicating that Lucille had delivered a nonviable girl who had weighed 555 grams. At trial, Dr. Alexander confirmed that Dr. Raminski's delivery note accurately reflected Dr. Alexander's observations and assessments of the baby following its delivery.

Dr. Alexander also asked Dr. Raminski to complete all of the paperwork concerning the delivery and to talk to the parents about the possibility of both an autopsy and the disposal of the baby's remains. Dr. Raminski could not recall at what time the parents signed the disposal consent form. However, Lucille testified she gave her consent at some point after she and her husband had seen the baby.

At some time after 1 a.m., Nurse Brenda Starnes was in the utility room cleaning the baby. She also started to fill out some of the paperwork associated with stillbirths. As she was leaving the room, Starnes heard a "gasp." Shortly thereafter, she heard a second "gasp." Using a stethoscope, Starnes examined the baby. She detected a faint heartbeat, but the baby displayed no other signs of life and appeared "dead."

Confused by what she had observed, Starnes went to the residents' lounge and spoke with Dr. Alexander. She asked him what the APGAR scores were for the Williams' baby. He responded, "zero" and "zero." She related to Dr. Alexander what she had heard, and he told her that it was a "reflex" associated with stillbirths.

Nevertheless, Starnes thereafter paged pediatrics. Starnes also took the baby into a delivery room and placed the baby on a "life island," a medical unit which provides a baby with radiant heat.

At approximately 1:45 a.m., one of the labor nurses called defendant Dr. Catherine McDermott, a pediatric resident, to the labor and delivery area of the hospital. The nurse told her that an extremely premature baby had been stillborn two hours earlier, with "zero" APGARS and that nurses had now detected a heart rate. Dr. McDermott recalled that, on the previous day, the supervising neonatalogist, defendant Dr. Louis Papp, told her that a woman was in obstetrics threatening premature labor. Dr. McDermott had not been told anything else about the baby prior to receiving the nurse's phone call. The nurse asked her to come and see the baby.

When Dr. McDermott arrived, she saw the baby on a life island in the delivery room. The baby was deeply cyanotic, purple, mottled, and very bruised. During her examination, Dr. McDermott told the nurses that the baby was having "reflexes," which she explained was

possible even if it were "dead." Dr. McDermott also noticed that the baby had some irregular "cardiopulmonary functions." Although Dr. McDermott stated that the baby was "alive" in layman's terms, she found the baby to be "brain dead."

Although Dr. McDermott concluded that nothing could be done for the baby, she saw that the nurses were upset. She decided, therefore, to telephone Dr. Louis Papp at his home at approximately 2 a.m. She informed Dr. Papp that the baby had "zero" APGAR scores, was cyanotic, and had no "reflex activity." Both Drs. McDermott and Papp agreed that they could offer no medical treatment to the baby. Dr. McDermott related this to the nurses. At no time during the phone call did Dr. McDermott or Dr. Papp mention the parents. Dr. McDermott instructed the nurses to explain the "gasps" as reflexes. Dr. McDermott then returned to her rounds.

Meanwhile, Dr. Raminski overheard the nurses and Dr. McDermott talking about the Williams' baby. They were discussing whether the baby had a heartbeat. Dr. Raminski could not recall whether this discussion between the nurses and Dr. McDermott occurred before or after Lucille had signed the consent to dispose form. Dr. Raminski stepped into the residents' lounge and told Dr. Alexander what he had seen. Dr. Alexander responded that the baby was stillborn and did not display any signs of life at the time of its birth.

At 2:30 a.m., Nurse Faye Brewer telephoned Georghetta Lucas, the head labor and delivery nurse, at her home. Brewer told her about the baby and informed her that the nurses were "upset." Lucas then called the labor and delivery unit and spoke with Kaeowichien. Approximately 15 minutes later, Lucas received another phone call from the adult intensive care coordinator, who also told her that her nurses were very upset. Lucas then left for the hospital.

At approximately 3 a.m., Nurse Helen Powell telephoned Ann Martin, the head nurse of the nursery, at Martin's home. Powell informed Martin about the baby. Both Martin and Lucas arrived at the hospital around 4 a.m. and went to see the baby, who appeared to be dead.

At approximately 5:30 a.m., while Martin and Brewer were talking with the nurses, Nurse Chan came in and told them to come and see the baby. Lucas observed that the baby was pink, and she heard a "cry." According to Martin, the baby appeared to be "improved."

After examining the baby, Martin spoke to Dr. McDermott on the phone. Martin asked her to examine the baby. Dr. McDermott replied that she had seen the baby earlier and that nothing medically could be done for it. Martin told her that she was going to call Dr. Papp.

Dr. Papp received a second telephone call from the hospital between 5:30 and 6 a.m from Nurse Martin. Based on Martin's description of the baby, Dr. Papp ordered the baby moved into the nursery and "intubated." Dr. Papp also told Martin that he was on his way to the hospital. Meanwhile, Dr. McDermott arrived in the nursery and began the intubation process, which was completed by 6:50 a.m.

Lucas then went to get Dr. Alexander. She told him that the stillborn baby was now in the nursery. Both he and Lucas then went to tell the baby's mother. Lucille, who had not seen or heard anything about the baby since 12:30 a.m., received a visit from Dr. Alexander at approximately 6 a.m. He informed her that the baby's heart had started to beat some time after delivery and that the baby was in the neonatal intensive care unit. Dr. Alexander told Lucille that the baby's chances for survival did not "look good."

Meanwhile, Dr. Papp arrived at the hospital and viewed the baby. He found the baby severely cyanotic. Based on his examination, he concluded that the baby lacked cortical functioning and that the baby's condition was consistent with what Dr. McDermott told him at 2 a.m. Dr. Papp testified that he had ordered the baby admitted to the nursery based on Nurse Martin's phone call; however, he would not have done so had he known the baby's true condition. The baby's final heartbeat occurred at 10:21 a.m.

## ANALYSIS

Plaintiffs contend that the circuit court improperly directed verdicts in favor of the defendants.

■ The supreme court announced the standard governing when a trial court should direct a verdict in the familiar case of *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504. The court held that a motion for a directed verdict should be granted "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so *overwhelmingly* favors movant that no contrary verdict based on that evidence could ever stand." (Emphasis added.) (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) Although bench and bar frequently quote the above standard, they often fail to cite the analysis utilized by the supreme court in crafting it. For example, the court in *Pedrick* recognized that the "presence of *some* [(emphasis in original)] evidence of a fact which, when viewed alone may seem *substantial*, does not always, when viewed in the context of all of the evidence, retain such *significance*," thereby allowing the direction of a verdict. (Emphasis added.) (*Pedrick*, 37 Ill. 2d at 504.) The court also noted that the entry of a directed verdict in cases where "no

*substantial* factual disputes exist" promotes the efficient and expeditious administration of justice. (Emphasis added.) *Pedrick*, 37 Ill. 2d at 504.

Despite the fact that courts are to not to "weigh" the evidence (see, *e.g., Maple v. Gustafson* (1992), 151 Ill. 2d 445, 454, 603 N.E.2d 508 (and cases cited therein)), the analysis in *Pedrick* suggests that some disciplined evaluation of the relative strength of the evidence must be undertaken in determining whether the motion should be granted. Indeed, the supreme court subsequently stated that its "decision [in *Pedrick*] fully contemplates that trial courts are to decide when weak evidence has so faded in the strong light of all of the proof that only one verdict is possible of rendition." *People v. Rosochacki* (1969), 41 Ill. 2d 483, 490, 244 N.E.2d 136.

The need for this "disciplined evaluation" is borne out not only by the use of the words "overwhelmingly," "substantial," "significance," "weak," and "strong," but also by the fact that our supreme court has recognized that the ruling on a motion for a directed verdict " 'necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.' " (*Reed v. Northwestern Publishing Co.* (1988), 124 Ill. 2d 495, 512, 530 N.E.2d 474, quoting *Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 252, 91 L. Ed. 2d 202, 214, 106 S. Ct. 2505, 2512 (holding that a trial court must apply the clear and convincing standard in a libel action when ruling on a motion for directed verdict). See also *Ray Dancer, Inc. v. DMC Corp.* (1992), 230 Ill. App. 3d 40, 50, 594 N.E.2d 1344 (clear and convincing standard of proof is implicated when the court rules on a motion for directed verdict or summary judgment in anti-trust conspiracy action).)

Accordingly, in ruling on a motion for a directed verdict, courts must evaluate the relative strength of the nonmovant's evidence in the context of the entire record at the time the motion is presented.[3] However, even though the evidence must be viewed in the light most

---

[3]In so doing, we note the *Pedrick* standard does not mandate that the court accept all the nonmovant's evidence as true in determining whether there is any credible evidence on which to send the case to the jury. (*Belleville National Savings Bank v. General Motors Corp.* (1974), 20 Ill. App. 3d 707, 313 N.E.2d 631.) Nor does the *Pedrick* standard require a complete lack of evidence with regard to the nonmovant's claim. Rather, a directed verdict is proper even when there may be evidence to support the nonmovant's allegations, but that evidence is found to be only a mere scintilla (*Cokinis v. Maywood-Proviso State Bank* (1980), 81 Ill. App. 3d 1057, 1063, 401 N.E.2d 1077) or, as noted above, when there is some evidence supporting the nonmovant's claim which loses its significance when viewed in the context of all

favorable to the nonmovant, that same evidence must also be considered with regard to the requisite burden of proof. What may be "significant" or "substantial" evidence in a case involving a preponderance standard may fall wide of the mark where the burden of proof is clear and convincing.

■ At this juncture, we must stress that this is not a medical malpractice case involving the preponderance standard. Indeed, although the record contains a generous amount of medical testimony and opinion, neither the pleadings nor the jury instructions assert the theory that the defendants fell below a standard of care applicable to the medical profession.

On the contrary, plaintiffs' cause of action is based solely upon common-law fraud. Plaintiffs, therefore, must establish that defendants, with the intent to induce plaintiffs to act, made a false statement of material fact which defendants knew or believed to be false. Plaintiffs must also show they justifiably relied on the statement and suffered damages resulting from that reliance. (*Gerill Corp. v. Jack L. Hargrove Builders, Inc.* (1989), 128 Ill. 2d 179, 193, 538 N.E.2d 530, quoting *Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286, 402 N.E.2d 599.) Most importantly, fraud must be proved by clear and convincing evidence. *Soules v. General Motors Corp.*, 79 Ill. 2d at 286.

In view of the above principles and with a firm appreciation for the maxim that no case should be lightly taken from a jury (*Du Bois v. Rose* (1991), 217 Ill. App. 3d 277, 279, 576 N.E.2d 1104), we proceed to review the propriety of the orders directing verdicts in favor of the various defendants.

We first examine plaintiffs' case of fraud *vis-a-vis* Dr. Alexander. Plaintiffs contend that the evidence raised sufficiently substantial questions of fact as to whether Dr. Alexander knew the baby was alive at the time of the delivery, 11:19 p.m., yet falsely represented that the baby was stillborn. We disagree.

■ In viewing the evidence in its aspect most favorable to plaintiffs, we find, as did the trial court, that the evidence so overwhelmingly favors Dr. Alexander that a verdict in plaintiffs' favor could not stand as a matter of law. In particular, plaintiffs' evi-

---

of the evidence. *Pedrick*, 37 Ill. 2d at 504; *Du Bois v. Rose* (1991), 217 Ill. App. 3d 277, 282, 576 N.E.2d 1104; *Romero v. Ciskowski* (1985), 137 Ill. App. 3d 529, 484 N.E.2d 1150; *Huff v. Elmhurst-Chicago Stone Co.* (1981), 94 Ill. App. 3d 1091, 1098, 419 N.E.2d 561; *Belleville*, 20 Ill. App. 3d at 712. Accord *Pennsylvania Truck Lines, Inc. v. Solar Equity Corp.* (7th Cir. 1989), 882 F.2d 221, 225 (applying Illinois law).

dence of the first and most rudimentary element of fraud, *i.e.*, a material misstatement of *fact*, is so weak when viewed in the context of the entire record that it loses its significance in light of the clear and convincing burden of proof. Similarly, plaintiffs presented a dearth of evidence with respect to Dr. Alexander's knowledge of the falsity of his purported misstatement as well as his intention to induce plaintiffs to act.

Dr. Alexander initially testified that, prior to delivery, the fetus' heart rate had ceased to register on the monitor at 11:10 p.m. He further noted that at the time of delivery, 11:19 p.m., the baby displayed absolutely no signs of life. When Dr. Alexander examined the baby at one and five minutes after birth, he obtained APGAR scores of "zero." Thus, both Dr. Alexander's personal observations of the child as well as his reading of the fetal heart monitor lend credence to his diagnosis of a stillbirth.

All of the eyewitnesses likewise corroborated that the baby displayed no signs of life immediately after delivery in the labor room. Specifically, Dr. Raminski testified that the baby appeared dead, as did Nurse Kaeowichien, who had assisted Dr. Alexander in the labor room. Even Dr. McDermott, who later viewed the baby on the life island in the delivery room, observed that the baby was cyanotic, purple, mottled, and bruised.

Plaintiffs' own expert, Dr. Marcus Hermansen, while asserting that the baby was born alive, conceded that if the fetal heart rate had stopped at 11:10 p.m. (as Dr. Alexander testified to) and the baby was thereafter born blue, a physician "could come to the conclusion that it was a stillbirth." In fact, Dr. Hermansen stated that "in retrospect" he could "see why someone may have said it [pronounced a stillbirth]"; however, in hindsight, that physician would have been wrong. Although Dr. Hermansen did testify that he believed the fetus had a heart rate at 11:10 p.m., he nevertheless agreed that the baby was born with no "observable" signs of life, but was in need of resuscitation.

Viewing this evidence in the light most favorable to plaintiffs, we find that, at most, they have raised only an inference of possible negligence in Dr. Alexander's assessment of the baby as stillborn. The record is simply devoid of any significant evidence of a material misstatement of fact. A misdiagnosis perhaps; maybe an error in a doctor's medical opinion. But certainly not fraud.

Nevertheless, plaintiffs maintain that even if Dr. Alexander in good faith believed that the baby was stillborn, he later learned that the baby's condition had changed and the baby had developed a heartbeat. Dr. Alexander, plaintiffs assert, kept that knowledge from them when he should have informed them otherwise.

Our courts have held that a party who had made a statement which at that time is true, but who subsequently acquires new information which makes it untrue or misleading, must disclose such information to anyone whom he knows to be acting on the basis of the original statement or be guilty of fraud. *St. Joseph Hospital v. Corbetta Construction Co.* (1974), 21 Ill. App. 3d 925, 953, 316 N.E.2d 51.

■ In this case, the evidence fails to support the inference that Dr. Alexander learned facts which made his original diagnosis of "stillbirth" false or misleading. Although Nurse Starnes testified that she told Dr. Alexander about the baby's "gasps" at 1 a.m., she also testified that Dr. Alexander told her that the gasps constituted "reflexes." Likewise, Dr. Raminski testified that he conferred with Dr. Alexander about the baby's possible heart rate. They discussed the delivery, and Dr. Alexander reaffirmed his *opinion* that the baby had been stillborn and that what the nurses were observing were "reflexes." Thus, Dr. Alexander did not change his original medical assessment of the baby. The only inference raised by Dr. Alexander's diagnosis of the "gasps" as "reflexes" is that they were medically incorrect.

Although plaintiffs characterize the baby's heart rate and gasps as facts indicative of life rather than "reflexes," these "facts" are subject to, and serve as a basis of, a doctor's professional judgment in rendering a medical opinion. In fact, the evidence adduced by both parties in this case amply demonstrates that Lucille's premature labor and delivery presented doctors with a serious medical situation which demanded "judgment calls" based upon medical knowledge and expertise. For example, there was conflicting testimony as to whether a fetal heart monitor should have been used, whether the baby was stillborn, and whether any resuscitation should have been performed. These conflicts in the evidence, which we cannot and do not resolve, merely reveal a difference in medical opinion, not the knowing misstatement of a material fact.

Therefore, if Dr. Alexander believed in his assessment, and there is nothing in the record to suggest otherwise, his failure to tell plaintiffs of the baby's post-delivery condition cannot constitute fraud. Medical negligence, actionable under the rubric of medical malpractice, ordinarily is not fraud.

That said, we do not intend to imply that a doctor could never be liable for fraud in certain cases. (See, *e.g., Gaines v. Preterm-Cleveland, Inc.* (1987), 33 Ohio St. 3d 54, 514 N.E.2d 709 (fraud appropriate cause of action when physicians told plaintiff they had removed her IUD, but knew that they had not).) This case, however, is not such a case.

In any event, plaintiffs point to certain circumstantial evidence which they claim shows Dr. Alexander knowingly concealed the baby's live birth and proves that he fraudulently told them it was stillborn. Their contention centers around the baby's APGAR scores recorded after the delivery. They claim that, contrary to Dr. Alexander's contention that he had assigned scores of "zero," the delivery record reflected APGAR scores of "one."

At trial, however, Dr. Alexander testified that when he arrived in the nursery at 6 a.m. and saw the delivery record, he noticed that scores of "one" had been entered on the chart under the APGAR heading for heart rate. Dr. Alexander announced that the APGAR scores on the chart were not the scores he had assigned at the time of delivery. He told those in the room that he was correcting the record.

Nurse Kaeowichien admitted at trial that she had entered the scores of "one" on the chart for heartbeat at some time after the delivery even though Dr. Alexander had told her that the scores were "zero." Kaeowichien was present in the nursery when Dr. Alexander found the discrepancy.

■ Again, viewing this evidence in the light most favorable to plaintiffs, we fail to perceive its strength in this action for fraud, where the evidentiary burden is one of clear and convincing evidence. The APGAR testimony presented the jury with only one possible inference, that is, that Kaeowichien entered the scores in contradiction to Dr. Alexander's orders. This is the only inference because no witness testified that Dr. Alexander assigned any score other than "zero" after delivery. The "changed scores," which plaintiffs argue evince a "coverup" supporting a theory of fraud, simply lose their significance when viewed in the context of the entire record. To find otherwise would require the jury to engage impermissibly in speculation and conjecture.

Moreover, we disagree with plaintiffs' suggestion that this evidence raises a factual question concerning Dr. Alexander's knowledge of the baby's viability at the time of delivery. No evidence exists which disputes the fact that Kaeowichien entered the scores of "one" in contradiction of Dr. Alexander's orders because there was no testimony that Dr. Alexander had ever assigned scores of "one" in the delivery room. In fact, Kaeowichien and Dr. Raminski corroborated Dr. Alexander's testimony that he had assigned scores of "zero" at the time the readings were made. Moreover, these witnesses corroborated Dr. Alexander's account of the correction he made to the delivery record. The evidence surrounding the correction of the APGAR scores simply does not raise any factual questions for the jury to resolve.

Based on our review of the evidence, we hold that a jury finding of fraud against Dr. Alexander could not stand as a matter of law.

We next address plaintiffs' contentions of fraud against Dr. Mc-Dermott. Plaintiffs maintain that Dr. McDermott concealed from plaintiffs the true nature of the baby's condition.

The concealment of the truth can be, of course, just as much a misrepresentation as is the assertion of a false statement. When the failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and an affirmative misrepresentation is virtually indistinguishable. Even a technically true statement may constitute a misrepresentation if the statement omits some qualifying material, because a half-truth oftentimes is more misleading than an outright lie. (*Lindsey v. Edgar* (1984), 129 Ill. App. 3d 718, 723, 473 N.E.2d 92.) For concealment to amount to a misrepresentation, it must have been done with an intent to deceive under circumstances creating an opportunity and a duty to speak. (*Lindsey*, 129 Ill. App. 3d at 723.) The concealed information must have been such that the other party would have acted differently had it been aware of it. *Huls v. Clifton, Gunderson & Co.* (1989), 179 Ill. App. 3d 904, 909, 535 N.E.2d 72.

In cases of concealment, the traditional fraud analysis is modified, and, in order to prove the concealment amounted to a fraudulent misrepresentation, a plaintiff must prove (1) the concealment of a material fact, (2) the concealment was intended to induce a false belief, under circumstances creating a duty to speak (*Lindsey*, 129 Ill. App. 3d at 723), (3) the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist, (4) the concealed information was such that the injured party would have acted differently had it been aware of it, and (5) the reliance by the person from whom the fact was concealed led to his injury. *Huls*, 179 Ill. App. 3d at 909. See also *Gary-Wheaton Bank v. Burt* (1982), 104 Ill. App. 3d 767, 433 N.E.2d 315.

■ Again, the evidence falls short of the mark in establishing Dr. McDermott's concealment of a material fact. Dr. McDermott testified that she believed the baby was brain-dead when she examined her at 2 a.m. The baby was cyanotic, purple, mottled, and bruised. The baby did not respond to stimuli. Dr. McDermott was told by the nurses that the baby had been stillborn, and Dr. McDermott stated that her examination corroborated this fact. Her conclusions were confirmed by Dr. Papp during their telephone consultation. Indeed, plaintiffs presented no evidence which tends to show that Dr. McDermott's as-

sessments were wrong. As in the case of Dr. Alexander, Dr. McDermott's medical "opinion" of the baby may constitute negligence, but it does not constitute fraud or concealment of a material "fact."

Additionally, no evidence was presented which tended to show that Dr. McDermott instructed hospital nurses to lie or deceive plaintiffs in any way.[4] In fact, she told the nurses to tell the baby's mother that the "gasps" were "reflexes" associated with the act of dying. The only inference to be drawn from this evidence is that Dr. McDermott believed the mother *would* in fact *see* the baby and might inquire as to the baby's apparent movements.

Nevertheless, plaintiffs contend that, in and of itself, the doctors' willingness to let them see the baby is insignificant. They maintain that the doctors knew that the child would simply appear dead to plaintiffs, who would not know any better. Plaintiffs insist that had they known the true nature of the baby's condition they would have demanded treatment. This argument is unpersuasive.

The evidence reveals Dr. Losure informed plaintiffs that if Lucille delivered the infant at that time, it would have no chance for survival. Indeed, he stated that no aggressive treatment would be performed on the infant in the event of a premature delivery. Therefore, even if plaintiffs had been told that the baby was "gasping," it is unlikely that their demands for treatment would have been heeded.

For the foregoing reasons, the circuit court did not err in directing a verdict in Dr. McDermott's case.

We next turn to the propriety of the circuit court's actions with respect to Dr. Raminski and Dr. Papp. As noted, plaintiffs alleged that both physicians concealed their knowledge of the baby's condition from plaintiffs.

We must iterate that the trial court directed verdicts for both Drs. Papp and Raminski at the close of the plaintiffs' evidence. As previously noted, in ruling on a motion for a directed verdict, courts must evaluate the relative strength of the nonmovant's evidence in the context of the entire record *at the time the motion is presented.* After reviewing the evidence presented only during the plaintiffs' case in chief, we agree with the trial court's determination.

■ Plaintiffs failed to present any evidence, let alone sufficient evidence to withstand the direction of a verdict, that Dr. Raminski

---

[4]In fact, the nurses in this case continually went "over the heads" of the doctors who were present at the hospital during the early morning hours of November 8, 1985.

committed fraud. Dr. Raminski, called as an adverse witness under section 12—1102 of Code of Civil Procedure (735 ILCS 5/12—1102 (West 1992)), testified that he believed the baby was dead at the time of delivery. His testimony was corroborated by that of Dr. Alexander, who stated that he did not detect any signs of life at the time of the delivery. None of the nurses testified that they informed Dr. Raminski of any of their observations regarding the baby's "improving" condition or asked for his medical advice or assistance. In fact, when Dr. Raminski overheard the nurses tell Dr. McDermott about the possibility of a heart rate, he, without being asked, conferred with Dr. Alexander. During the conversation, the two physicians talked about the delivery and reaffirmed the medical assessments made at that time. Thus, Dr. Raminski possessed no knowledge that the baby was "alive" and had no reason to inform plaintiffs that the baby was alive. As a result, he did not misrepresent or conceal the baby's condition to Lucille at any time.

Moreover, Dr. Raminski did not attempt to hide the baby from the parents. Indeed, it was Dr. Raminski who encouraged the couple to see the baby after they had initially declined the opportunity to do so. Dr. Raminski further testified that none of his superiors instructed him to keep any information from plaintiffs, and there simply is no evidence to the contrary.

 Our review of the evidence with regard to Dr. Papp compels a similar conclusion. Plaintiffs presented evidence of only one conversation between him and Dr. McDermott. Based on information he received about the baby's condition from Dr. McDermott, Dr. Papp concluded that the baby was cortically dead. Dr. Papp testified that during the conversation, he did not instruct Dr. McDermott to conceal anything from plaintiffs. There was no evidence to suggest that he did. Dr. Papp stated that he never consulted with Dr. Alexander or Dr. Raminski, and the record does not support any inference to the contrary.

Dr. Papp's second conversation with Nurse Martin prompted him to admit the baby into the nursery. Plaintiffs seemingly suggest that Dr. Papp had a duty to telephone Lucille from his home after he ordered the baby admitted to the nursery. We decline to so hold under the circumstances of this case. Dr. Papp made his decisions without any knowledge of what the parents had been told. He ordered treatment without even seeing the baby. Once he arrived at the hospital, he evaluated the infant's medical condition and then went to speak to plaintiffs. Plaintiffs simply failed to present any evidence that Dr. Papp concealed a material fact.

 Plaintiffs, however, contend that a discrepancy in the recorded

weights of the baby created a factual dispute regarding Dr. Papp's state of mind. Following the delivery, the baby's recorded weight was 555 grams. Upon admission to the nursery, the baby's weight was recorded at 607 grams. Dr. Papp, seeing this discrepancy, had the baby reweighed. At that time, the baby weighed 552 grams. Dr. Papp considered the 607-gram figure to be erroneous because the second weight was more consistent with his observations of the baby's condition and with the delivery weight. Nevertheless, Dr. Papp recorded all three weights in his progress notes.

This evidence does not support an inference of fraud. We note that none of plaintiffs' witnesses testified that Dr. Papp knew of the baby's nursery admission weight. Dr. Papp stated that he noticed the 607-gram weight at the time he arrived at the hospital. Therefore, it is impossible that Dr. Papp knew of the 607-gram reading at 2 a.m., when he purportedly concealed the baby's true condition from plaintiffs. Again, plaintiffs have failed to offer any substantial evidence of fraud with regard to Dr. Papp.

Based on the foregoing, the circuit court did not err in directing verdicts for either Dr. Papp or Dr. Raminski at the close of the plaintiffs' case in chief.

Our review of the trial court's decision is not only done with the recognition that no case should be lightly taken from the jury (*Du Bois*, 217 Ill. App. 3d at 282-83), but also with a full appreciation of the solemnity of life and death and the seriousness of the alleged conduct of the various defendants. We are not unmindful of the need to preserve a viable jury system, and we do not lightly disregard plaintiffs' right to have their case tried by a jury. However, we simply are unable to glean from the record sufficient evidence which would even remotely provide a basis for the determination of a jury verdict in plaintiffs' favor. Accordingly, we hold that the circuit court correctly entered directed verdicts in favor of defendants. Our disposition of this issue makes it unnecessary to address plaintiffs' second contention regarding the propriety of the circuit court's direction of verdicts with regard to the imposition of punitive damages against defendants.

Affirmed.

COUSINS, P.J., and McNULTY, J., concur.