In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-3057

DRUCKZENTRUM HARRY JUNG
GMBH & CO. KG,

*Plaintiff-Appellant,*

*v.*

MOTOROLA MOBILITY LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09-CV-7231 — **John W. Darrah**, *Judge.*

ARGUED APRIL 18, 2013 — DECIDED DECEMBER 18, 2014

Before BAUER, FLAUM, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* A German printing company sued
Motorola Mobility LLC, the cell-phone manufacturer, alleging
that it breached a supply contract for printing services. In early
2008 Motorola agreed to make a good-faith effort to purchase
2% of its cell-phone user-manual needs from Druckzentrum

Harry Jung GmbH & Co., a printer based in northern Germany. Halfway through the two-year contract period, Motorola's cell-phone sales contracted sharply. In response to the downturn, Motorola decided to consolidate its cell-phone manufacturing and distribution operations in China and buy all related print products there. Motorola notified Druckzentrum of the shift, and the two companies continued to do business together for a few more months during the transition.

The loss of Motorola's business did Druckzentrum in; the printer entered bankruptcy in Germany and brought this suit against Motorola alleging breach of contract and fraud in the inducement of the contract. Among other things, Druckzentrum claimed that the contract gave it an exclusive right to all of Motorola's user-manual printing business for cell phones sold in Europe, the Middle East, and Asia during the two-year contract period. The district judge rejected this claim on the pleadings and later entered summary judgment for Motorola on the rest of the case, finding no evidence to support either a claim of breach of contract or fraud.

We affirm. The parties' written contract contains no promise of an exclusive right to all of Motorola's printing business in Europe, the Middle East, and Asia. And because the contract is fully integrated, Druckzentrum cannot use parol evidence of prior understandings to upset the bargain the parties put in writing. Moreover, although Motorola promised to make a good-faith effort to purchase 2% of its cell-phone user-manual printing needs from Druckzentrum for a two-year period, the contract listed several reasons Motorola might

justifiably miss the target. These included business downturns of the sort Motorola experienced, and there is no evidence that it acted in bad faith by moving its printing and distribution activities away from Europe. Finally, the evidence is insufficient to create a jury issue on the claim that Motorola fraudulently induced Druckzentrum to enter into the contract or continue performing under it.

## I. Background

Druckzentrum is a printer based in Flensburg, Germany. Motorola is based in Illinois but maintains operations globally. In 1995 Motorola began using Druckzentrum to print user manuals for its cell-phone products marketed in Europe, the Middle East, and Asia—a marketing area apparently known in the trade as the "EMEA" region. During this time period, Motorola manufactured its phones in China and shipped them to a distribution facility in Flensburg, where they were packaged with user manuals printed by Druckzentrum and distributed for sale throughout the EMEA region.

In 2007 Motorola embarked on a program to improve the way it purchased products from vendors. At workshops conducted in fall 2007, Motorola educated vendors on the new process by which they could bid for contracts. Vendors first had to sign a "Corporate Supply Agreement" with a stated effective date of October 1, 2007. Druckzentrum was among the vendors invited to participate. After signing the agreement, Druckzentrum representatives attended a workshop in Illinois.

The materials distributed during the workshop made it clear that vendors would bid for a particular product "segment"—e.g., printed materials, cardboard boxes, plastic packaging, and so forth. It was less clear whether vendors were bidding for a particular *region* as well. Although the bidding materials contain many references to regions and vendors were supposed to state a bid in reference to a particular region, it is not clear whether Motorola would actually award work on a regional basis.

During the bidding process, Motorola shared its sales forecasts with vendors. Bidders needed to know what sales volume they could expect in order to set prices and ensure that they had capacity to meet demand. Motorola told Druckzentrum that it expected to sell 37 million mobile phones in the EMEA region in 2008 and made other rosy projections.

After bidding for the print segment in the EMEA region, Druckzentrum was given an "Initial Award" consisting of a "base share" of 2% and a "swing share" of 8%, meaning that Motorola made a "commitment" to buy 2% of print products from Druckzentrum and could, at its option, buy another 8% of print products from the company. The percentages were stated on the basis of global spending; thus, 2% of print means 2% of global print purchases, not 2% of EMEA print purchases. But there was no "commitment" in an absolute sense; rather, Motorola promised only to make a good-faith effort to hit the target and identified various commercial factors that might lead it to miss. All of this was embodied in a Notice of Initial Award, which the parties refer to as the "NIA" but we will simplify and just call "the contract."

Motorola sent a signed copy of the contract to Druckzentrum on January 23, 2008, although the previously executed Corporate Supply Agreement, which was incorporated by reference, stated an effective date of October 1, 2007. Another quirk is that the parties did not finalize prices until *after* Motorola awarded Druckzentrum the contract. As a result Motorola purchased nothing from Druckzentrum for the first few months of the contract. As the parties negotiated over prices during the winter and early spring of 2008, Motorola regularly sent updated sales forecasts to Druckzentrum. The updated forecasts showed revised downward sales projections, but they were in a different format than the earlier forecasts; Druckzentrum's fraud claim centers on the change in formatting.

After finalizing pricing, Druckzentrum countersigned the contract in April 2008, and Motorola started placing orders. By its terms, the contract was good through September 30, 2009, "unless terminated earlier." Among various other grounds for early termination, Motorola could terminate the contract "for convenience" on 90 days' written notice.

Throughout calendar year 2008, Motorola's cell-phone sales in the EMEA region dropped precipitously, and by November of that year, Motorola decided to shutter its German operations in favor of a "direct ship" model. Under the new model, everything would happen in China, including the printing of user manuals. Motorola orally notified Druckzentrum of this decision by phone on November 4, 2008. On November 18 Motorola's purchasing agent in Germany notified Druckzentrum by email that all business would conclude by

the end of the first quarter of 2009. Motorola and Druckzentrum continued to do business during this transition period. When orders ceased, Druckzentrum sent a notice of cancellation dated April 24, 2009. On July 1, 2009, Motorola faxed a formal letter terminating the contract.

Sometime after losing Motorola's printing business, Druckzentrum entered bankruptcy in German courts. Druckzentrum then sued Motorola in federal court in the Northern District of Illinois alleging claims for breach of contract and fraud. First, Druckzentrum alleged that it had a two-year exclusive right to all of Motorola's print business for cell-phone products destined for the EMEA market, and by moving the work to a Chinese vendor, Motorola breached the contract. Another theory of breach centered on Motorola's failure to meet the 2% purchasing target. On the fraud claim, Druckzentrum alleged that Motorola fraudulently misrepresented its sales prospects during the bidding process, inducing Druckzentrum to bid at lower prices and continue performing to its detriment.

The district court dismissed the exclusivity claim on the pleadings, holding that the contract did not give Druckzentrum an exclusive right to Motorola's printing business in the EMEA region. Following extensive discovery, Motorola moved for summary judgment on the remaining claims, and the court granted the motion. The judge explained that the contract required that Motorola make a good-faith effort to hit the purchasing target but also provided that changes in commercial circumstances would excuse a miss. Because there was no evidence of bad faith—Motorola had

moved its operations to China in response to plummeting sales—the judge concluded that there was no breach. The judge also held that Motorola gave proper notice of termination by emailing Druckzentrum on November 18, 2008, saying that business would cease and the Flensburg facility would close by the end of the first quarter 2009.

Finally, Druckzentrum's fraud claim rested on an argument that the sales forecasts Motorola provided during the bidding process were misleading. The judge rejected this claim as well, holding that there was no evidence that Motorola "knowingly misled [Druckzentrum] about its sales forecasts in an attempt to induce [it] to reduce pricing or otherwise enter into an agreement." After resolving a few other disputes not relevant here,[1] the judge entered final judgment for Motorola, and Druckzentrum appealed.

## II. Discussion

### A. Breach of Contract

Druckzentrum argues that it had an exclusive right to all of Motorola's user-manual printing business for cell phones marketed in the EMEA region during the two-year contract

---

[1] For example, the parties disputed the import of the contract's backdated effective date. Recall that although the parties did not begin performing until price negotiations concluded and the award was countersigned in April 2008, the effective date listed on the Corporate Supply Agreement was October 1, 2007. The dispute over the effective date of the contract is relevant only on the question of damages, and because there was no breach of the contract, we need not resolve it.

period. If that's true, then Motorola broke its exclusivity promise by moving its printing business to a Chinese vendor halfway through the contract period.

Druckzentrum admits, as it must, that the written contract does not contain an *express* exclusivity promise. Rather, Druckzentrum contends that Motorola made the promise during the bidding process. This argument requires resort to parol evidence, which is foreclosed by the contract's integration clause. The contract contains an "Entire Agreement" provision clearly stating that "[t]his Agreement is the entire understanding between the parties concerning this Initial Award and supersedes all earlier discussions, agreements and representations regarding this Initial Award."

The Uniform Commercial Code, as adopted in Illinois, provides as follows:

> § 2-202 Final written expression: parol or extrinsic evidence.
>
> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing *intended by the parties as a final expression of their agreement* with respect to such terms as are included therein *may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented*
>
>> (a) by course of performance, course of dealing, or usage of trade … ; and

> (b) *by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.*

810 ILL. COMP. STAT. 5/2-202 (emphases added).

Druckzentrum tries to fit the facts of this case into subsection (b), which permits the importation of consistent terms from prior agreements but *only* if the contract is not fully integrated. *Id.* § 5/2-202(b); *see also id.* cmt. 1. Motorola counters that the contract is in fact fully integrated and cannot be supplemented by parol evidence of prior agreements. In the words of the Illinois statute, the contract was "intended … as a complete and *exclusive* statement of the terms of the agreement." *Id.* § 5/2-202(b) (emphasis added).

The contract language supports Motorola's position. The integration clause plainly states that "[t]his Agreement is the *entire* understanding between the parties … and supercedes *all* earlier discussions, agreements and representations … ." (Emphases added.) In an effort to overcome this unambiguous text, Druckzentrum argues that because the contract incorporates extrinsic materials by reference, it cannot reasonably be understood to be an exclusive statement of the parties' agreement despite the presence of an apparently conclusive integration clause. This argument backfires. When a contract expressly incorporates specific extrinsic materials by reference, the proper inference is that other, unmentioned extrinsic agreements are *not* part of the contract.

Moreover, the rule in Illinois is that "[i]f the additional terms are such that if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact." 810 ILL. COMP. STAT. 5/2-202 cmt. 3 (explaining when a contract is fully integrated). Druckzentrum's claim of exclusivity in the EMEA region suggests that it considers this to be one of the key benefits of the deal. If the parties truly contemplated that Motorola was making such a critical promise, they certainly would have included it in the written contract.

Finally, Druckzentrum argues that the contract award is ambiguous and the presence of ambiguity means that the contract cannot be fully integrated. Even if the factual premise of this argument is correct, the legal conclusion does not follow. The existence of contractual ambiguity may allow consideration of extrinsic evidence to clarify those portions of the contract that are unclear. But it does *not* warrant a conclusion that the contract is not fully integrated such that evidence of prior agreements can be used to import entirely new terms.

And indeed the factual premise is not correct. Druckzentrum's argument about contractual ambiguity hinges on an implausible interpretation of the structure of the initial award. By its terms, the contract awarded Druckzentrum "2% of Base Share for the Print Segment with up to an additional 8% Swing Spend." Druckzentrum points out that 2% + 8% = 10%, and notes that 10% *just happens* to be the percentage of Motorola's worldwide print spending attributable to the EMEA region. Druckzentrum suggests that by stating the

award in this way, Motorola promised exclusivity in the EMEA region, and parol evidence would confirm that interpretation.

It's true that the award is stated in technical terms. But it is not unclear. Motorola did not promise Druckzentrum 10% of its worldwide print spend; it promised 2% of its worldwide print spend with another 8% constituting a "swing spend" that it could award at its discretion. Because the contract is fully integrated and unambiguous (or at least unambiguous on this point), Druckzentrum cannot use parol evidence to prove up an enforceable promise of exclusivity in the EMEA region.

Druckzentrum also argues that Motorola breached the contract by failing to meet the 2% target during the contract period based solely on its own commercial interests. There is obviously no dispute that Motorola missed the target after it ceased doing business with Druckzentrum at the end of the first quarter of 2009.[2] Motorola responds that it promised only a good-faith effort to meet the purchasing target, and the contract specified that the actual purchases would vary based on a number of commercial factors, including changes in business conditions.

---

[2] Motorola notes that it exceeded the 2% target for the financial quarters during which it was making purchases from Druckzentrum—sometimes by a significant amount—and that when spread over the life of the contract, its purchases came close to meeting the 2% target. Druckzentrum counters that Motorola's performance cannot be spread over the life of the contract but must be judged on a quarterly basis. We do not need to resolve this dispute. As we explain in the text, the contract required only a good-faith effort to meet the purchasing target. Because there is no evidence of bad faith on Motorola's part, there was no breach.

More specifically, the contract provides as follows:

> Motorola will use good faith efforts to award Products to Druckzentrum Harry Jung that in the aggregate, are reasonably likely to achieve the target percentage identified in the Initial Award. However, the actual percentage realized by Druckzentrum Harry Jung may vary from the target percentage due to a variety of factors, including but not limited to the following: i) one or more Motorola products in which Products are used does not achieve the level of success in the marketplace that was expected by Motorola; ii) one or more products in which Products are used, or the Products themselves, launches late, has a quality problem, is delayed in qualification, experiences a production interruption, is rejected by a Motorola customer, or is cancelled for whatever reason; iii) divestiture or other major change in Motorola's business; or iv) factors outside of Motorola's reasonable control that impact the percentage realized. Motorola is not liable, and Druckzentrum Harry Jung will have no claim against Motorola, for any percentage variance from the target percentage identified in the Initial Award.

Read fairly and in context, this provision means that Motorola will not be liable for breach if, despite its good-faith efforts, one of the listed circumstances or something comparable prevented it from meeting the 2% purchasing target. In

other words, Motorola did not assume an absolute duty to meet the purchasing target during the contract period; rather, it assumed a duty to make a good-faith effort to meet the target. Certain adverse business circumstances—including a drop in the level of success of Motorola's products in the marketplace—might excuse a miss.

And the evidence is undisputed that Motorola implemented its direct-ship distribution model in response to plummeting sales in the EMEA region. This entailed moving its user-manual printing business to China, where its cell phones were manufactured. A falloff in sales is specifically listed in the contract as one of the circumstances that would justify missing the 2% purchasing target. "Contract law does not require parties to behave altruistically toward each other … ." *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992). Rather, bad faith occurs when "a provision [is] invoked dishonestly to achieve a purpose contrary to that for which the contract had been made." *Id.* Motorola's promise to make a good-faith effort to meet a purchasing target did not require it to adhere to a business model that protected Druckzentrum's interests even in the face of a significant downturn in its cell-phone sales. To the contrary, the contract specifically contemplated that Motorola might miss the target if its products were less successful than anticipated or in the event of a "major change in [its] business."

The situation might be different if Motorola had switched to a cheaper print vendor in China while retaining its original distribution model; if that were the case, it might be possible for a jury to find that Motorola acted in bad faith. The situation

would also be different if Motorola's switch to the direct-ship model was motivated specifically by a desire to ditch Druckzentrum as a vendor. And the situation would certainly be different if Motorola had retained its existing business model and simply switched to a cheaper print vendor in Germany. But these are not the facts here. Motorola's decision to cease purchasing from Druckzentrum was part of a broader change in its business model undertaken in response to a significant downturn in sales. Druckzentrum points to no evidence of bad faith.

Finally, Druckzentrum complains about the form of Motorola's termination notice. The contract provided that "Motorola may terminate for convenience upon ninety (90) days prior written notice to Supplier." Druckzentrum argues that the November 18, 2008 email was not sufficient because it was not a "written notice." Druckzentrum also notes that the email did not comply with other contractual formalities;[3] a formal notice of termination was not sent until July 1, 2009. For its part, Motorola insists that the email sufficed as formal written notice of termination.

We don't need to resolve this skirmish. Druckzentrum is not arguing that the claimed inadequacy of the November 18 notice is an independent basis on which to find a compensable

---

[3] For example, the contract specified that "notices and other required communications will be in writing, in the English language and will be transmitted … by: (i) personal delivery; (ii) expedited delivery service; (iii) registered or certified mail … ; or (iv) electronic facsimile." The email was in German and was not transmitted by any of the specified delivery methods.

breach of contract. Instead, the dispute about the sufficiency of the notice relates only to the proper measure of damages. In other words, if the November 18 email sufficed as a notice of termination, then any damages for Motorola's failure to meet the 2% purchasing target would stop accruing 90 days after that date. Because there was no breach of contract in the first place, the dispute about the emailed termination notice is immaterial.

## B. Fraudulent Inducement

Druckzentrum also contends that Motorola's sales forecasts fraudulently induced it to enter into the contract and to continue performing under it. Early on in the case, Druckzentrum claimed that Motorola's initial sales forecasts were inflated and that Motorola knew it. By the time the case reached summary judgment, however, Druckzentrum had disclaimed this theory. And rightly so—its own employees testified that they did not believe Motorola's initial forecasts were knowingly false.

Instead, Druckzentrum's fraud claim rests entirely on an argument about the updated forecasts Motorola provided during price negotiations over the winter and early spring of 2008. Under Illinois law, "a party who had made a statement which at that time is true, but who subsequently acquires new information which makes it untrue or misleading, must disclose such information to anyone whom he knows to be acting on the basis of the original statement or be guilty of fraud." *Williams v. Chi. Osteopathic Health Sys.*, 654 N.E.2d 613,

620 (Ill. App. Ct. 1995); *see also St. Joseph Hosp. v. Corbetta Const. Co.*, 316 N.E.2d 51, 71 (Ill. App. Ct. 1974) (same).

Druckzentrum contends that the updated forecasts were misleading because a change in formatting made it difficult to compare them to Motorola's earlier sales projections. But the duty to disclose newly acquired information does not include a duty to use exactly the same format for the disclosure. Druckzentrum has not identified anything in the updated forecasts that was inaccurate, much less willfully false.

Finally, Druckzentrum argues that because it was induced to agree to pricing based on a promise of exclusivity in the EMEA region, Motorola had a duty to identify which portions of the revised forecasts were specifically applicable to it. This argument is new on appeal and as such is considered waived. *Williams v. Dieball*, 724 F.3d 957, 961 (7th Cir. 2013) ("We have specifically emphasized that 'a party has waived the ability to make a specific argument for the first time on appeal when the party failed to present that specific argument to the district court, even though the issue may have been before the district court in more general terms.'" (quoting *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010))).

For the foregoing reasons, the record supports neither a fraud claim nor a breach-of-contract claim. The district court properly entered summary judgment for Motorola.

AFFIRMED.