SECOND DIVISION 

APRIL 20, 1999

1-98-2352

TRADE CENTER, INC., an  ) Appeal from the 

Illinois corporation,  ) Circuit Court

  ) of Cook County

Plaintiff-Appellant,  )

  )

v.  ) No. 97 L 14596

  )

DOMINICK'S FINER FOODS, INC.,  )

a Delaware corporation,  ) The Honorable

  ) David Lichtenstein,

Defendant-Appellee.  ) Judge Presiding.

JUSTICE COUSINS delivered the opinion of the court:

This case arises from a contract dispute concerning the amount of compensation to be paid to the plaintiff for running a promotional program at certain of the defendant's stores.  The parties stipulated to most of the relevant facts, so all that remained for the trial court was a narrow contract interpretation issue.  The parties filed cross-motions for summary judgment, and the trial court ruled in favor of the defendant.  The plaintiff now asks this court to reverse the order granting summary judgment to the defendant and to remand with directions to enter summary judgment for the plaintiff.

We affirm.

BACKGROUND

Dominick's Finer Foods, Inc. (Dominick's), the defendant in this action, operates a chain of grocery stores in the Chicago metropolitan area.  The Trade Center, Inc. (Trade Center), the plaintiff, designs and assists in the implementation of marketing promotions.  This case arises from a contract dispute concerning the amount of compensation to be paid to the Trade Center for running a promotional program at certain Dominick's stores for a trial period.

Dominick's, like its main competitor, Jewel, offered a discount card to customers who signed up for it.  Certain discounts were available exclusively to customers presenting this card when they purchased their groceries.  Dominick's called this the "Fresh Values Card" (Fresh Card).  Patrons who used the Fresh Card tended to be loyal customers.  The Fresh Card could not be used at all Dominick's stores. 

Dominick's wished to make its discount card program more attractive than Jewel's.  In order to do so, it contracted with the Trade Center to provide an extra benefit for its Fresh Card customers.  The Trade Center's marketing plan was known as "Smart Money," or "Mega Money." 

Customers displaying the Fresh Card at the time of purchase would receive certificates made out in dollar amounts equalling one fourth of the money spent.  For example, if a customer with a Fresh Card spent $100, he or she would be given $25 in Smart Money certificates.  The customer could then use these certificates as cash to pay a certain percentage the price of goods or services at any of about 20 other stores, referred to by the parties as "participating retail partners."  For example, if the allowable percentage were 50%, a customer could buy a $50 
item at such a store for $25 cash and $25 in Smart Money certificates.

Dominick's and the Trade Center agreed to conduct a 12-week trial run of the Smart Money plan at four grocery stores before implementing it throughout the Dominick's chain.  In order to evaluate the impact of the Smart Money plan more accurately, sales figures at the test stores were compared with sales figures at a control group of stores that did not participate in the test.  None of the control stores used the Fresh Card.  Under the agreement, the Trade Center was to receive compensation based on the increase in sales that the four test stores experienced over the trial period.  Unfortunately, the contract did not specify whether the relevant sales figure was the increase in total sales or the increase in sales to Fresh Card customers.  Dominick's advocates the former interpretation, while the Trade Center advocates the latter.

As it happens, Dominick's total sales in the test stores did not increase by a statistically significant amount during the trial period.  However, the proportion of those sales made to Fresh Card customers did rise significantly.  In short, total sales remained steady while Fresh Card sales increased.  As a result, if Dominick's interpretation is correct, the Trade Center is not entitled to any compensation.  Conversely, if the Trade Center's interpretation is correct, it is entitled to approximately $225,000.  The Trade Center filed suit for breach of contract requesting damages in this amount.  

The parties stipulated to most of the relevant facts.  All that was left for the trial court was the narrow contract interpretation issue.  The parties filed cross-motions for summary judgment, and the trial court ruled in favor of Dominick's.  The Trade Center now asks this court to reverse the order granting summary judgment to Dominick's and to remand with directions to enter summary judgment for the Trade Center.

ANALYSIS

I

Courts attempt to give effect to the intent of the parties in construing a contract.  
Omnitrus Merging Corp. v. Illinois Tool Works, Inc., 
256 Ill. App. 3d 31, 34, 628 N.E.2d 1165, 1168 (1993).  We consider the contract as a whole in order to ascertain the intent of the parties.  
Wilson v. Wilson, 
217 Ill. App. 3d 844, 850, 577 N.E.2d 1323, 1327 (1991). The contract provided that the Trade Center's compensation was to be calculated in accord with a table in "Attachment B," and a formula in "Attachment C."  

"Immediately following expiration and evaluation of the test of the Program at Dominick's, Dominick's will, within thirty (30) days after receipt of the evaluation results, pay the Trade Center, as consideration for the Trade Center's above-

mentioned program responsibilities as per Attachment B, in accordance with the available results.  The evaluation of the Smart Money Program will be designed and performed by Willard Bishop & Associates and a model of that design is attached herewith as Attachment C."

In the Attachment B table the size of the payment to the Trade Center depends on the variable "% Incremental Sales Inc[rease]."  Both parties agree that the case turns on whether "% Incremental Sales Inc[rease]" refers to the increase in total test store sales during the trial period or, instead, to the increase in Fresh Card sales in the test stores.

Dominick's, citing the Webster's II New College Dictionary (1995) definition of "sales" as "gross receipts," urges that the commonly accepted meaning of "sales" is total sales.  Words in a contract are to be given their ordinary and accepted meaning unless the agreement itself unequivocally provides otherwise.  
Frydman v. Horn Eye Center, 
286 Ill. App. 3d 853, 858, 676 N.E.2d 1355, 1359 (1997).  In our view, however, this dispute cannot be resolved merely by looking in the dictionary.  The word "sales," standing alone, does not answer the questions "sales of what?" and "where?"  One must look to the context.  See generally 5 M. Knifflin & J. Perillo, 
Corbin 
on Contacts §24.7 (rev. ed. 1998).  Accordingly, we turn to Attachments B and C in sequence.   

A

Attachment B, which shows how the Trade Center's compensation was to be calculated, is reproduced below.  ("DFF" stands for "Dominick's Finer Foods, Inc.")

Variables

# of Stores

4

4

4

4

4

Avg Weekly Sales

$480, 151

$480, 151

$480, 151

$480, 151

$480, 151

Avg Gross Margin (%)

16.90%

16.90%

16.90%

16.90%

16.90%

# of Weeks in Test

12

12

12

12

12

% Incremental Sales Inc

1.00%

2.00%

3.00%

4.00%

5.00%

Base Sales

$23,042,461

$23,042,461

$23,042,461

$23,042,461

$23,042,461

Sales with Smart Money

$23,272,886

$23,503,310

$23,733,735

$23,964,159

$24,194,461

Incremental Sales $

$230,425

$460,849

$691,274

$921,698

$1,152,123

Incremental Gross Margin $

$38,942

$77,884

$116,825

$155, 767

$194,709

Smart Money Program Cost

$3,049

$3,049

$3,049

$3,049

$3,049

DFF Profit Before Expenses

$35,893

$74,835

$113,776

$152,718

$191,660

DFF Front End Labor Expense

$29,733

$29,733

$29,733

$29,733

$29,733

Payment to Trade Center

$6,160

$45,102

$84,043

$122,985

$161,927

Both parties agree that "Base Sales" was determined by multiplying the average weekly sales per store times the number of stores times the number of weeks in the test.

According to Dominick's, "Sales with Smart Money" is the actual dollar amount of sales in the test stores during the trial period.  Then, the "% Incremental Sales Inc[rease]" was determined by calculating the percent that "Sales with Smart Money" exceeded "Base Sales."  This figure would then be adjusted as provided in Attachment C in order to control for extraneous market factors.  Ultimately, under Dominick's interpretation, the payment to the Trade Center is the net increase in profit attributable to Smart Money.

According to the Trade Center, "Sales with Smart Money" does not represent actual income and is not an empirically determined figure at all.  Rather, it is the result of a calculation that is performed by increasing "Base Sales" by the "% Incremental Sales Inc[rease]."  The "% Incremental Sales Inc[rease]" itself is the increase in Fresh Card sales and is imported from Attachment C, rather than being calculated in Attachment B.  That is, the payment to the Trade Center was to be determined by multiplying the percentage increase in Fresh Card sales times the base total sales and then deducting expenses.

Dominick's interpretation of Attachment B coheres more fully with the contract as a whole.  First, we note that "Sales with Smart Money" is more appropriate as a description for test store sales while the Smart Money program was in place, rather than for total store sales increased by the percentage increase in Fresh Card sales.

Furthermore, the figure obtained by subtracting the "Smart Money Program cost" from the "Incremental Gross Margin" is called "DFF profit before expenses."  Under the Trade Center's interpretation, this figure would not really be Dominick's profit from the Smart Money program, but would be an arbitrary figure derived by multiplying the increase in Fresh Card Sales times the expected gross margin from all sales, and then deducting costs.  "Profit" is generally understood to mean income minus costs. See Black's Law Dictionary 1211 (6th ed. 1990) ("Most commonly, the gross proceeds of a business transaction less the costs of the transaction").  The figure from which costs are deducted in the chart in order to determine the profit is "Incremental Sales $."  So it is reasonable to think that this figure represents income from the Smart Money program.  But under the Trade Center's interpretation, "Incremental Sales $" is just the percent increase in Fresh Card sales times the base (total store) sales.

According to the Trade Center's interpretation, the term "% Incremental Sales Inc[rease]" is the basis for rather than the result of calculations in Attachment B.  Many other variables, under this view, are defined by reference to that figure.  For instance, "Incremental Sales $" is the "% Incremental Sales Inc[rease]" multiplied by "base sales."  And "Incremental Sales $" added to "Base Sales" yields "Sales with Smart Money."   

The Trade Center not only does not explain why the words "Fresh Card" do not appear in the term "% Incremental Sales Inc[rease]," but also why they do not appear in any of the other terms ultimately derived from Fresh Card sales under its interpretation.  While the term "Fresh Card sales" is used elsewhere in the agreement, it appears nowhere in Attachment B.  

Terms used in one sense in one part of a contract are presumed to be used in the same sense in another part, unless a contrary intent is evident.  
Thompson v. Amoco Oil Co., 
903 F.2d 1118, 1121 (7th Cir. 1990).  The fact that the parties evidently thought it was necessary to qualify the word "sales" if it was to refer to "Fresh Card sales" elsewhere in the contract supports the conclusion that that was their understanding of the word "sales" in Attachment B as well. 

B

Attachment B provides that the "% Incremental Sales Inc[rease]" figure is to be determined "as identified in Attachment C," the relevant portion of which provides:

"4. The final evaluation will involve comparing the trend on a percentage basis in the Fresh Card test Panel with that in the control panel for the baseline versus the last two weeks of the test period.  For example:

> If the control panel sales trend is up 2% for the 12 weeks and;

> the Fresh Card test panels are up 6%, then;

> it would be concluded that Smart Money produced a 4% improvement, i.e., 6% less 2%.

5. The percentage increase in sales attributable to Smart Money will be used to calculate payment to the Trade Center using the Attachment B Financial Model."

According to the Trade Center's interpretation, the purpose of this formula was to determine the percent increase in 
Fresh Card 
sales attributable to Smart Money.  However, the obvious way to get a figure for the percent increase in Fresh Card sales attributable to Smart Money would be to subtract the increase in Fresh Card sales without Smart Money from the increase in Fresh Card sales with Smart Money.  But the Trade Center contends that it was to be done by subtracting the increase in the 
total store 
sales at the control panel stores from the increase in 
Fresh Card 
sales at the test panel stores.  The method suggested by the Trade Center would only make sense if one assumed that the Fresh Card sales in the control panel stores (if the control panel stores had the Fresh Card) would rise at the same rate as total store sales.  But, as the results of the test demonstrate and the Trade Center itself apparently admits, such an assumption would be false.  "[T]here was no necessary connection between the success of the program as an incentive to stimulate Fresh Card use and an increase in total store sales."  Therefore, we cannot agree with Trade Center that "[t]he comparison of the relative percentage changes in Fresh Card sales in the Test Panel and total sales in the control panel was a perfectly reasonable and logical method for evaluating the effectiveness of the Mega Money Program as an incentive for Fresh Card use." 

One might argue that, given that the control panel stores did not have the Fresh Card, this was the best way to approximate the figure of the increase in Fresh Card sales attributable to Smart Money.  However, if the increase in Fresh Card sales attributable to Smart Money were the key figure in which the parties were interested, logically they should have put some stores with the Fresh Card in the control panel when designing the test in the first place.

According to Dominick's interpretation, the figure derived in Attachment C is the increase in total 
store 
sales attributable to Smart Money.  Dominick's contends that this figure was to be calculated by subtracting the increase in control panel store sales from the increase in the test panel store sales.  Indeed, that would be a sensible way to arrive at that figure; if one subtracts a store sales figure from another store sales figure, the result will also be a store sales figure.  Accordingly, we believe that the wording of the agreement lends more support to Dominick's interpretation than to the Trade Center's.

II

Even, 
arguendo, 
if the text of the contract were genuinely ambiguous, rather than favoring Dominick's interpretation, we believe that Dominick's interpretation would be preferable because it would describe a reasonable, conventional type of agreement. 

" 'Where a contract is susceptible to one of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, interpretation which makes rational and probable agreement must be preferred.' "  
Chicago Title & Trust Co. v. Telco Capital Corp., 
292 Ill. App. 3d 553, 557, 685 N.E.2d 952, 956 (1997), quoting 
Nutra Sweet Co. v. American National Bank & Trust Co., 
262 Ill. App. 3d 688, 695, 635 N.E.2d 440 (1994).

See also 
Rubin v. Laser, 
301 Ill. App. 3d 60, 67, 703 N.E.2d 453, 459 (1998). 

Under Dominick's interpretation, on the one hand, the contract would be the familiar type of agreement where the amount of money paid for a service is contingent upon the amount of income brought in by that service.  Such an agreement is prudent because the more income that is brought in, the more money one can afford to pay for the service.  

The Trade Center, on the other hand, does not explain why Dominick's would wish to tie compensation to the increase in Fresh Card sales without regard to whether total sales increased.  Presumably, Dominick's is in business to make money rather than to get people signed up for its discount card.  To show the irrationality of such an arrangement, Dominick's points out that if compensation were determined in this fashion, and overall sales had remained steady while Fresh Card sales went up to 50% of the total, it would have owed the Trade Center almost $2 million, although the program would have brought Dominick's no extra profit.  If, as argued by the Trade Center, the parties wished to structure compensation in this unusual manner, they should have been explicit.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

RAKOWSKI and McNULTY, JJ., concur.